# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

RECEIVED

JAMILA DAVIS
a/k/a JAMILA BAKER

DEC 3 0 2011

AT 8:30_____M
WILLIAM T. WALSH, CLERK

Petitioner,

vs.

Docket No.: 2:05-CR-0482-JLL-01

UNITED STATES OF AMERICA,

Respondent.

_____/

## MOTION FOR RECONSIDERATION AND/OR MOTION TO ALTER OR AMEND JUDGMENT PURSUANT TO RULE 59(e) OF THE FEDERAL RULES OF CIVIL PROCEDURE

COMES NOW, Petitioner Jamila Davis, with motion for reconsideration pursuant to Rule 59(e) of the Fed. R. Civ. Pro. and in support provides as follows:

### INTRODUCTION

In the Title 28 U.S.C. § 2255 denial dates November 28, 2011, this Court reviewed each of my eight Title 28 U.S.C. § 2255 claims and denied them all. Concededly, as a *pro se* litigant, my statement of and support for these claims was often awkward and less than precise. For that reason, and because of the significant constitutional issues at stake, in a real and vital way, in this habeas case, I ask this Court to reconsider and to alter its judgment on two issues. For the same reasons, I seek leave to submit a Supplemental Affidavit in support.

19

**PETITONER SEEKS RECONSIDERATION OF THE TWO INEFFECTIVENESS ISSUES:**

**(A) WHETHER MY LAWYER, THOMAS NOOTER, MISADVISED ME ON THE LAW (MATERIALITY, LOSS AND INTENT) WHICH THEN TAINTED MY DECISION TO GO TO TRIAL, AND;**

**(B) WHETHER NOOTER WAS INEFFECTIVE DURING MY SENTENCING WHEN HE FAILED TO LITIGATE THE LOSS AMOUNTS UNDER § 2B1.1 OF THE SENTENCING GUIDELINES.**

Each of these issues meets the *Strickland v. Washington*, 466 U. S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984) two prong test, since both deficient performance actions resulted in prejudice to the Petitioner: (a) the erroneous advice on materiality induced the Petitioner to go to trial, which resulted in a lengthier sentence then if she would have pled guilty, and (b) the failure to challenge loss amount at sentencing, when their were clear loss issues and evidence available to contest the loss figures, resulted in a lengthier sentence.

Therefore, it is the Petitioner's claim that counsel's performance was in fact ineffective according to *Strickland's* standards. As such her constitutional right to effective counsel was violated.

## I. PRE-TRIAL ADVICE

There were three ways in which Nooter's pre-trial advice was deficient: One, he advised me, strongly, that if we could show Aurora/Lehman employees knew about, and indeed facilitated, these fraudulent mortgage loans, we had a

defense to bank fraud under the materiality doctrine. He explained materiality as a requirement, in fraud cases, to show that the victim actually relied on the deceptive act when it was put at risk of loss. This was deficient advice, and in fact ineffective. *Neder v. United States*, 527 U.S. 1 (1999), is the seminal case on materiality. There, the Supreme Court defined materiality: "A false statement is material if it has a natural tendency to influence, or is capable of influencing, the decision of the decision-making body to whom it is addressed." *Id.*, 527 U.S. at 16 (quotation omitted). This is a "reasonableness" standard: it refers to natural tendency to influence, not whether the false statement did in fact influence the decision-maker. To this extent, the district court was correct in rejecting Nooter's proposed jury instruction, and the Third Circuit so found.

The *Neder* Court was even more explicit. It also held that the common law requirements of justifiable reliance and damage "have no place" in the federal bank fraud statute. *Id.*, 527 U.S. at 24-25. Thus, whether Aurora/Lehman in fact relied on my "Al Rodd's" false documents were arguably wholly irrelevant. If one shepardizes *Neder* in the Third Circuit (surely an elemental step of pre-trial preparation) the principle is even more forcefully stated: "Moreover, in deciding whether an individual has committed bank fraud, we do not consider whether the bank exercised due care in attempting to prevent the loss..." *United States v. Khorozian,* 333 F3d 498, 506 n.6 (3d Cir. 2003), *citing Neder*, 527 U.S. at 24-25.

Nooter claims it didn't matter whether he erred on the materiality standard because it was a secondary defense, that the primary thrust of the defense was the absence of any intent to deceive. (*Nooter Aff.,* para. 14) Nooter also claimed that, even if the "Al Rodd" documents weren't material, the falsified HUD statements surely were. This Court accepted both points. Court Order of Denial at, p. 9.

However, the issue whether the materiality defense was in fact secondary at trial or not is irrelevant. The gist of my ineffectiveness claim on this topic is that Nooter's mistaken advice on the law induced me to go to trial. It convinced me I had a stronger position on the merits than I really did. What matters is what he told me pre-trial, not how the trial actually played out.[1] To the extent Nooter and I factually conflict (we do), and is just cause for a hearing.

Second, Nooter misadvised me when he claimed I had to litigate loss, and specifically my efforts to mitigate loss, at trial to preserve the issue. (See Supp. Aff. Para. 10) Of course, these facts were relevant only to sentencing, in establishing my base offense level under § 2B1.1 Nooter claimed I should have been aware of sentencing loss litigation because of my prior experience in EDNY and California. (Nooter Aff. para 5) This Court adopted that inference. (Court Order of Denial, pp. 7-8) This is an unwarranted inference. The EDNY case was

---

[1] This also makes the point about the HUD statements legally irrelevant. In any event, the HUD statements (which were not falsified by me) only summarized the terms of sale. It was the falsified mortgage loan applications that actually induced the loans.

"cut and dried."  There was literally no loss litigation at all, much less anything comparable to the complexities of the instant case.  This is a matter of record.  In addition, in the California case, the successful litigation of loss was based primarily on my own efforts.  As well, it all occurred *AFTER* sentencing in the instant case.  This is also a matter of record.  (See Supp. Aff., Paragraphs 5 and 6.) The only reason to recommend trial on my efforts to mitigate the loss would have been to show an absence of any intent to defraud.

And this brings me to Nooter's third legal error.  Of course, Bank Fraud, Title 18 USC 1344 is *a specific intent crime* that requires, under either prong, intent to put a bank at risk of loss by a deceptive act.  *See United States v Thomas*, 315 F3d 190 (3d Cir. 2002).  To this extent, Nooter's pre-trial advice to me was correct.  But he left out one important piece: "that a defendant is presumed to intend the natural consequence of one's actions."  In other words, regardless of whether I wanted to repay the bank ultimately, I did *"intend"* to get the loans in the first place by artifice.  That was the point of my obtaining the "Al Rodd" documents and submitting them to Infantino.  I intended for the false documents to work.  This Court properly advised the jury on this point.  (See Trial Transcript 11.50-51) Nooter failed to advise me of this aspect of intent law which could and did seriously undermine the defense position that I had no intent to permanently

defraud the bank.  Indeed, whether I intended to repay or not was irrelevant.  (See Trial Transcript 11.53)  Yet Nooter advised me exactly to the contrary.

Had I received full and accurate legal advice in all of the above areas, I would not have proceeded to trial but would have instead chosen to plead guilty. (See Supp. Aff. Para. 13)

## II. FAILURE TO LITIGATE LOSS IN BASE OFFENSE LEVEL CALCULATION

This ineffectiveness issue is clear.  At no time before or during my sentencing did Nooter challenge loss calculation insofar as it was used to establish my base offense level under 2B1.1.  Loss was extremely complicated in this case. There were multiple appraisals setting forth a range of fair market property values. There was the issue of the renovations I had made to the properties.  There was the question of the allow ability of interest in the amortized mortgaged.  Attorney fees were at issue, as were the mortgage payments I had made.

Chicago Title provided the Probation office lump-sum loss figures on each property.  The Probation officer used these figures in their entirety.  Nooter failed to object to these figures as part of the base offense level loss calculation.  Without an objection, this Court was not required to fact find under Rule 32 of the Federal Rules of Criminal Procedure.  Thus, the issue was not preserved for appeal.  For want of a nail... Nooter freely conceded this error before the Third Circuit, alas to no avail:

6

"Appellant now sees that she should have urged the sentencing court to review the calculations of the 'loss amount', fixed at $14,001,221 by the Probation Department ... in making the initial guideline calculation of the base offense level, rather than arguing that the loss amount overstated the seriousness of the crime and that the court should grant a departure. Because it was not raised in that form below, appellant concedes that the standard of review is 'plain error'".

In this 2255 affidavit, however, Nooter is less forthcoming. He states in paragraph 25 that he submitted loss analysis to the Court, but he fails to state that it was only to support the "over seriousness" downward departure, not the § 2B1.1 loss calculation up front.[2]

Nooter then claims that he discovered the *Goss* decision after the opening brief was filed (he didn't, I did) and decided to address it in the Reply Brief. This misrepresents the full nature of his confession of error in the Third Circuit - which was that he erred in not challenging base offense level in trial court in the first place. Nooter also acts as if *Goss* somehow set forth a new fair market loss principle. (Aff. Para. 26) It did not. All it did was re-iterate a loss calculation principle already well-established, not only in the Fifth Circuit, but also in ***the Third Circuit as well.*** See *Unites States v. Napier*, 273 F.3d 276, 279-280 (3d Cir. 2001)(defendant entitled to most reliable valuation of property; sale price was adequate where district court found that sales price was arms-length and resulted

---

[2] Nooter states in Para. 26 of his affidavit that the fair market value loss argument "had been made in the district court in the written submissions to the Court..." It was not made in the district court. The written submissions confirm this. Else wise, Nooter would not have conceded error before the appellate court.

25

from decline in market); *United States v. Sharma*, 90 F3d 220, 228 (3d Cir. 1999)(defendant entitled to credit for asset retained by victim as determined by appraised market value); *United States v. Medford*, 194 F3d 419, 421 (3d Cir. 1999)(fair market value of loss may be ascertained by averaging competing appraisals). *See generally United States v Kopp*, 951 F.2d 521, 527-28 (3d Cir. 1991)(in ascertaining loss on fraudulent bank loans, court should use actual loss as measured by fair market value). (See also § 2B1.1 of the USSG, Comment 3(c)(i))

Defense counsel may not disguise deficient performance by merely labeling it as a strategic choice. *United States v. McCoy*, 410 F.3d 124, 135 (3d Cir. 2005). But that's precisely what Nooter has done. Unfortunately, he did it so well that this Court adopted his reasoning wholesale. (See Denial, pp. 10-11)  As such, his Court should reconsider the prior ruling.

### III. ERRONEOUS PREJUDICE STANDARD

In its denial, this Court stated, in regard to the materiality issue, that "Petitioner cannot show that the result of her trial would have been different 'but for' this allege [sic] deficiency." (Court Order of Denial, p. 8)

First, the *Strickland* prejudice standard is not a "but for" standard. It is not outcome determinative. Rather, the standard is whether a *reasonable probability* exists that, *but for the errors,* the result would have been different. *Strickland,* 466 US 486, 694 (1986). *Strickland* express adopted the *Brady* materiality prejudice

standard. *Id.,* at 693.  In analyzing that standard, Justice Souter has characterized "reasonable probability" as more accurately a "significant possibility," to emphasize its low threshold.  *Stickler v Greene,* 527 U.S. 263, 297, 298 (1999)(concurring op.).

Second, the issue is not whether Nooter's legal errors affected trial outcome. I alleged that Nooter's misadvice, on materiality and elsewhere, caused me to opt for trial instead of a guilty plea.  I so averred.  My decision is the outcome that is rendered suspect by Nooter's deficient performance.

## IV. HEARING REQUIREMENT

An evidentiary hearing on a Title 28 U.S.C. § 2255 petition may be denied only where the file and the records of the case conclusively show that the prisoner is entitled to no relief. *Id.* Title 28 U.S.C. § 2255(b)   A district court must accept all Petitioner's non-frivolous fact claims as true.   Only if Petitioner then conclusively does NOT establish a colorable claim may a district court summarily dismiss. *United States v Dawson,* 852 F.2d 923, 928 (3d Cir. 1998).  The standard is liberal. *Cherys v. United States,* 405 Fed. Appx. 589 (3d Cir. 2010).  *See* Govt. of *Virgin Islands v. Forte,* 865 F.2d 59, 62 (3d Cir. 1989).  *See also McCoy,* 410 F.3d at 134 (court justified in summary disposition only if indisputable that attorney performance satisfied Strickland standard).

9

A hearing is compelled by this Title 28 U.S.C. § 2255 record, including this Motion to Reconsider and Supplemental Affidavit. I have established a factual issue as to the nature of the pre-trial advice Nooter gave me, and whether it impacted my decision to go to trial. Some aspects of these claims depend not only on my own credibility, but also can be substantiated by other witnesses at a hearing. Most compelling, however, is Nooter's record confession before the Third Circuit that he erred in not litigating loss as it pertained to base offense level. With multiple appraisals conducted, disputes over what offers were made when, numerous types of costs to be excluded or included, the question of loss is long overdue for fact-finding. Due process requires no less.

## CONCLUSION

Based on the above, I respectfully request this Court to grant my request to reconsider and/or alter the denial of my Title 28 U.S.C. § 2555 petition. Furthermore, I also request that an evidentiary hearing immediately be ordered.

Done this __19__, day of December 2011

Jamila Davis
Register No. 59253-053
Danbury Correctional Institution
33 ½ Pembroke Road
Danbury, CT 06811

10

## **CERTIFICATE OF SERVICE**

I HERBY DO CERTIFY that a true and correct copy of this motion requesting leave to file memorandum of law in excess of 40 pages was mailed to: United States Attorney's Office, District of New Jersey, 970 Broad Street, 7th Floor Newark, NJ 07102.

Done this _19_, day of December 2011

_Jamila Davis_

Jamila Davis
Register No. 59253-053
Danbury Correctional Institution
33 ½ Pembroke Road
Danbury, CT 06811

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

JAMILA DAVIS
a/k/a JAMILA BAKER

    Petitioner,

vs.           Docket No.: 2:05-CR-0482-JLL-01

UNITED STATES OF AMERICA,

    Respondent.

_____/

## SUPPLEMENTAL AFFIDAVIT OF JAMILA DAVIS

  Comes Now, Jamila Davis and submits this Supplemental Affidavit in support of my Title 28 U.S.C. § 2255 Petition and Motion to Reconsider denial of same:

## INTRODUCTION

  1. I am a *pro se* litigant. I submitted an affidavit to support my opening Title 28 U.S.C. § 2255 motion filed on 10/08/10, but I did not assert in it all relevant facts. I did assert other facts in my verified reply of June 11, 2011, but because of that document's unwieldiness, they likely escaped this Court's attention. This Supplemental Affidavit sets forth these and other relevant facts in a clearer fashion. It also corrects factual error in Attorney Thomas Nooter's affidavit of May 19, 2011.

## BACKGROUND OF ATTORNEY-CLIENT RELATIONSHIP

2.  I first met Attorney Thomas Nooter on September 28, 2000.  He was my court-appointed counsel in my first Federal case in EDNY (Case CR-00-1105-3 (DGT)).  There, I pled guilty to one count of conspiracy to commit bank fraud and wire fraud.  I had participated in a scheme to improve persons' credit scores by falsely adding good credit histories to their own, to enable them to acquire luxury automobiles.[1]  I would later be indicted in Central District of California for Conspiracy to Commit Mail Fraud, on an extension of the same credit scheme (Case 04-00172-004).  Mr. Nooter represented me there, too.

3.  I very much liked Nooter. He was older, very congenial. He was very concerned about my personal well-being, as well as my legal issues. He acknowledged my potential, and he wanted me to fulfill it without being brought down by legal problems or hurdles from "the street." He was like a mentor to me who encouraged me to change.

---

[1] My initial sentencing memo to this Court (June 27, 2008, pages 8-32) set forth in exhaustive detail my personal background.  Suffice it to say, I was from a middle class family, raised by parents who had worked hard to pull themselves up from Southern poverty. I understood hard work; I excelled at school while working simultaneously. From a young age, I was driven to succeed. Unfortunately, I also adopted some of the negative values of the urban environment: I measured success by flashy materialism. I became the problem-solver for the Hip Hop community in cars, real estate needs, etc. I thrived off of my status, and I learned to skirt the law to maintain it.

4. Loss was not a litigated issue in the EDNY case. The prosecutor claimed a loss amount, and later modified its own position to reduce it. We did not contest it. Therefore, I never had the occasion to review then with Nooter the role loss plays under the U.S. Sentencing Guidelines (USSG) in determining a white collar criminal sentence, and how it is calculated. I was sentenced in that case on January 28, 2002. I received 5 years probation, in part due to a favorable position of FBI Agent Khatabi. (I learned that he respected the way I "stepped up to the plate" to accept responsibility and to ensure that my then-boyfriend and a close friend were not put in trouble because of me.)

5. In my California case, I was charged in April 2004 and arrested while at my Probation Officer's office. I called Nooter from jail and asked him to represent me. This was the first contact I had with him since we had gotten a tentative probation violation dismissed in February 2002. (I'd been at a store with a girlfriend and she used a false credit card.) He agreed to represent me. We had several meetings in 2004 about this case and he flew to California with me for arraignment. To the extent Nooter's work calendars show meetings with me in 2004, they exclusively concerned the California case. We had perhaps three meetings on this case. Proceedings were delayed, so I did not plead guilty until November 2008 and was sentenced in 2009, well after proceedings in the instant

3

New Jersey case were concluded. I was in California on writ from FCI Danbury October 29, 2008 to June 6, 2009.

6. Loss in my California case was hotly contested, but I was the one who researched the loss issue and fed Nooter the arguments to make. The government initially proposed a loss figure of 1.2 million. Nooter came to see me at FCI Danbury in September 2008. He advised me to accept the plea and concomitant loss figure because it would not result in more time than I was already serving on the New Jersey case. I agreed to plea but insisted on challenging loss. Having already conducted my own research on USSG loss calculation at the prison law library, I was more versant with the issue than before. I told Nooter I would not accept 1.2 million because it exceeded my culpability. Only because I rejected it did Nooter return to the prosecutor and make the specific arguments on loss that I gave him. The prosecutor revised the loss position to subtract interest and other non-includables to about $300,000. I still wasn't satisfied because the loss exceeded the time period of the scheme or was unsubstantiated by creditors. I again insisted Nooter return, and again the prosecutor dropped the loss figure to $207,000. I still noticed that in many cases the false credit had actually been suppressed and never relied on by any creditors. I insisted Nooter find these print-outs, which he did. He presented them the day before my sentencing on February 25, 2009. I spoke with the prosecutor, and he agreed to lower the loss figure to

4

$197,000. I conceded and was sentenced to 18 months, concurrent with the instant sentence. In my view, this was how loss negotiation should proceed. But all of this negotiation took place at my own initiative and well after the instant New Jersey sentencing occurred.

## DEFENSE REPRESENTATION 2003-2005

7. In the criminal scheme in this case, I became aware of my co-defendant Rickard's failure to make mortgage payments in spring 2003, because the straw buyers were receiving late notices from the bank. I hired Attorney David Carmel to check the attorney trust fund Rickard and co-defendant Ellis maintained for payments. I was livid because I was concerned that what I had (mistakenly) believed was a business "shortcut" was morphing into full-fledged fraud. Attorney Carmel then learned of the FBI fraud alert Chicago Title caused to be issued based on non-recordation of title. Carmel advised me to immediately seek out a criminal defense attorney. I did so. I contacted Al Decottis. He had a conflict of interest and could not represent me. He referred me to Walter Timpone. I hired Timpone April 2003, based on that referral and his personal contacts with the New Jersey US Attorney's offices. I had regular communication with Timpone through 2003 and into 2004, about the fraud alert and about issues I had regarding FBI Agent Sean McCarthy's conduct.

8. Timpone's marching orders to me were: "Mitigate the bank's loss or go to prison for a long time!"   I took those orders seriously. See Mitigation of Loss section below.

9. Timpone had multiple contacts with the AUSA on my case. In early 2005 (before the first Indictment issued June 14, 2005),Timpone advised me of a possible open plea offer of up to 30 years, with loss to be settled later. I was concerned how vague the offer was.  I had two main issues that stayed with me as the criminal case unfolded:  First, I felt that in some intrinsic way, Aurora and Lehman shared responsibility for this mess by the way their de facto representative Infantino had induced the whole scheme in the first place (and indeed, encouraged additional deals after the first successful one) and by Aurora employee Diane Bauer's careful coaching of the loan applications to eliminate obvious defects. I may not have understood the proper legal significance of this issue, but just as a lay person, something felt unfair, not right, about it.  Second, I knew for a fact that Lehman had sold these properties, during one of the biggest real estate booms in recent history, for a huge loss. I was sure they could have been disposed of at fair market value with little or no loss to Lehman. I also believed that I had been stymied in my efforts to eliminate any loss. To me, it seemed as if Lehman intentionally allowed the loss to happen. This was the second major "sticking point" for me.

## CHANGE OF COUNSEL TO NOOTER

10.   In early 2005, I consulted with Nooter about this case. I had one conversation with him where I described the case facts, and I believed he reviewed some case documents. I conveyed to him my two main concerns, as I have just described. Unlike Timpone, Nooter expressed to me that, if we could show there was no intent to defraud the bank (by my effort to mitigate and the bank's collusion), this could be a complete defense to the substantive charge of bank fraud. He convinced me this was a viable shot. Nooter, Timpone and I met together around Easter 2005. We had only this one joint meeting, which my boyfriend Ron Dixon also attended. We discussed the open plea. I reiterated my concern that Lehman had sold at a loss and effectively barred me from mitigating it. Nooter said it was important to litigate the loss issue before the judge. He said loss was relevant to the question of whether I intended to deceive the bank. He said it showed further wrongdoing by the bank, which, together with their collusion on the applications, meant they were not susceptible to being defrauded. He was insistent I had to litigate loss at trial to preserve the issue. His reasoning impacted me greatly. At a minimum, I could not agree to plead guilty without further consideration of a trial option. I also decided at that point to change attorneys. Thus, when the indictment issued in June 2005, Nooter was already my attorney of

7

record. I turned myself in on July 7, 2005. Timpone had already arranged my release on bail, and I was sent home after arraignment.

11.   I met with Nooter several times around the date of the June 2005 indictment. These meetings were primarily to familiarize Nooter with the case background and my unsuccessful mitigation efforts. For the second half of 2005, we had very little contact. Nooter was trying to access discovery.

12.   In the spring of 2006, we had more contact.   We met jointly with co-defendant Brenda Rickard and her attorney. They had collected many documents on disk, which they provided to us. I believe Nooter met with the new prosecutor in early 2006, at which meeting he saw the falsified "Al Rodd" documents I had obtained. This negatively affected his estimation of whether we could succeed at trial. We discussed this in the parking lot of Attorney Paul Casteleiro's office (my civil attorney.)   Nooter did tell me these documents would harm my defense, unless we could show they weren't relied on. But, if we could show that, he still felt we would have a theory to get around them. This was when he explained to me about "materiality" as a fraud defense.   But at no time did he tell me we did not have any kind of a decent chance at trial.

## DECISION TO GO TO TRIAL

13.   Later, after this discussion, Nooter saw the Diane Bauer faxes to Infantino. At that point, he became much more optimistic.   He felt this really

8

bolstered the materiality defense; specifically, he explained that if Bauer in fact did not rely on the falsified applications, I could not be guilty of fraud. At that point, I firmly decided to go to trial. If I had known that materiality depended on what a reasonable person would adjudge relevant, rather that the actual bank employee involved, I would have been much more hesitant about going to trial. If I had known that loss was solely a sentencing issue, and not relevant to guilt or innocence, I absolutely would have not have gone to trial. At no time did Nooter review with me the details of loss calculation under section 2B1.1 of the Sentencing Guidelines and its relationship to sentencing. I was not otherwise aware of these loss details (such as exclusion of interest, attorney fees, and use of fair market value as loss measurement) because we did not have to litigate these issues in the 2001 EDNY case. And, the California loss calculation occurred well after these events.

14. For the rest of 2006, we communicated about every 2-3 months until my arrest in September on falsified state charges. I was locked up from September 2006 to January 2007. My bail was set at $1 million cash. Attorney Casteleiro, who had New Jersey criminal law experience, eventually got me released on a reduced bail. I was then violated by this Court, my EDNY Court and the California Court. Nooter helped me resolve these issues, and I was placed on 24 hour home

detention in late January 2007. By then, Nooter had become court-appointed because I could no longer afford to pay him, due to my incarceration.

## TRIAL

15. Our trial was set for early 2007. Nooter did not contact a mortgage industry expert, as I suggested pre-trial, to learn about the mortgage industry. He did not obtain independent appraisals on the property (this did not happen until I arranged it myself at sentencing). He did not speak with the defense attorney on the Fitzgerald case in California, which had the same fact pattern as mine. He did not call all the potential investors I had tried to line up to buy these properties. He did not research the corporate relationship between Aurora and Lehman. I did not understand the significance of these omissions until much later.

16. Trial proceeded. At trial, around the time of witness Brandi Mohammad's testimony, Judge Linares called a sidebar for the attorneys and suggested the parties explore a plea. Nooter immediately told me about it. I remarked that I was interested in a plea. I felt extremely remorseful because I saw through the trial testimony how much my conduct had damaged some innocent people. Nooter advised against me accepting a plea at this time, saying we had gone too far and that the trial had been going extremely well for us. My father Hosea Davis was present for this conversation.

10

17. I was convicted within two hours of jury deliberation. I went home (still on house arrest at my parent's home). Nooter filed a post-motion for acquittal which was denied. While awaiting sentencing, I received a referral to Jay Fahy for my appeal, from Attorney Al Decottis. Fahy suggested that I get independent appraisals on the properties. I did so in spring of 2008. My father retained Fahy to handle my appeal, but he did virtually nothing. The only other sentencing preparation was Nooter's efforts of preparing a sentencing memorandum and calling most of the parties, who he did not speak to pre-trial that had come into the US Attorney's office to make offers in 2003.

## SENTENCING

18. I was interviewed by Probation for my Presentence Report (PSR) in early 2008. Nooter was present. Nooter received the draft report and filed objections dated 4/22/08. He challenged the 2 point million dollar enhancement, the 4 point manager enhancement, and made numerous factual corrections. He also argued the recommended sentence overstated the seriousness of the crime. At no point did he object to the loss figures provided by Chicago Title and adopted by the Probation Officer, as a challenge under 2B1.1 of the Guidelines to the recommended Base Offense Level.

19. My sentencing was scheduled for May, then postponed to July 2008. Nooter submitted a sentencing memo dated 6/27/08, re-arguing his PSR objections.

11

He then sent a sentencing letter to the Judge 7/10/08 with charts attached analyzing loss, but only in so far as it supported his "seriousness of offense" argument, not as a loss offense level argument under 2B1.1. On 7/14/08, Lehman counsel Greenbaum submitted a statement rebutting Nooter's 7/9/08 letter contesting loss from the property sale. Nooter replied by memo dated 7/16/08. He accepted some of Lehman's counterpoints on loss, and reviewed in detail all of my efforts to mitigate loss. He also distinctly argued, for the first time, that Lehman's nationwide mortgage policies were predatory in this case, but he gave it no legal framework.

20.   My sentencing lasted about one hour. The judge reviewed the defense objections and denied them. Nooter acknowledged that the loss figures submitted by the Chicago Title were accurate. Again, he did not present loss as a 2B1.1 base offense level argument, but only to support over seriousness of offense. Therefore, the 2B1.1 issue was not preserved for appeal.  Against Nooter's wishes, I allocuted. I was sentenced to 151 months and taken into custody. Nooter timely filed a notice of appeal.

21.  I arrived at FCI Danbury on August 20, 2008. The first thing I did was to hit the library. I read the US Sentencing Guidelines. I discovered the whole body of case law regarding loss calculation under 2B1.1 (e.g., interest is to be excluded). I realized in my case that, although some interest was excluded, a large sum of interest (millions) in the amortized mortgage payments had not been excluded.

12

There were other potential exclusions which could not be identified because of the Court's wholesale adoption of Chicago Title lump-sum loss figures. (See PSR, pp. 22-24). Also, I should have been credited for services I rendered, such as renovation. Most importantly, I learned about fair market value as a loss measure met under 2B1.1. I read it in the 2B1.1 commentary and in reading Third Circuit case law. This taught me that we should have had express factfinding on loss amount under 2B1.1 on a whole range of issues in order to correctly fix my sentence. I also realized loss was a major sentencing issue which we should have argued in depth from the start, instead of as a "backfill" downward departure argument.

## APPEAL

22. I immediately xeroxed all this material and mailed it to Nooter. He told me that I had made good points which should have been raised at sentencing. He visited me at FCI Danbury in early September 2008, to present an offer on the California case. We discussed 2B1.1 in detail, as it related to the California case. I assumed he would use the same arguments in my New Jersey appeal. At that time, I did not know about preservation of error and plain error review.

23. Nooter filed an opening brief in my Third Circuit appeal on November 13, 2008. He brought me my copy on November 18 while we were in California for me to plea out. When I read it, I was shocked that none of the 2B1.1 arguments

13

had been made. I handed him the Goss Fifth Circuit case, which my co-defendant Rickard had located. This case reiterated the already-established rules on fair market value and other 2B1.1 issues. Nooter said he would include it in the reply brief. He said it was better to do so in the reply because the government would not have a chance to rebut it. He did not say anything about waiver and plain error review.

24. I read in Nooter's 3/9/09 reply brief his confession of error:

"Appellant now sees that she should have urged the sentencing court to review the calculations of the 'loss amount', fixed at $14,001,221 by the Probation Department ... in making the initial guideline calculation of the base offense level, rather than arguing that the loss amount overstated the seriousness of the crime and that the court should grant a departure. Because it was not raised that form below, appellant concedes that the standard of review is 'plain error.'"

*Id.* Reply at 15 (footnote omitted).

25. It was not until I read the Third Circuit denial ("in her reply brief, Davis argued for the first time that the total loss resulting from the scheme was incorrectly calculated. Since she did not raise this claim before, we will not consider it." Denial, p. 13, n.10 (citation omitted)) that I realized the core issue in my case - loss amount - had effectively been botched by my lawyer. In other words, I was sunk.

26. I also understood from the Third Circuit denial that the trial court had been correct, and my lawyer wrong, on the materiality standard. This meant that the entire course of pre-trial advice given to me by Nooter had been deficient.

26. I arranged an attorney-client phone call with Nooter in July 2009. He acknowledged that he committed an important error. He explained to me about Title 28 U.S.C. § 2255 motions and post-conviction relief. He said his court-appointment would not include such work but he would "fall on his sword" and represent me on a 2255 motion. He said to have my dad call him to discuss a retainer. My dad later told me Nooter wanted a $5,000.00 retainer to represent me. I held off. In November 2009 I was yet again in County Jail (Bergen) on one of FBI Agent McCarthy's fabricated charges. I spoke with a paralegal, who advised me there may be a conflict for Nooter to represent me on a Title 28 U.S.C. § 2255. I later arranged a conference call with him, my dad and Nooter. Nooter again acknowledged his error (to all of us) and said he would submit an affidavit so stating. He also turned over all the documents to this paralegal, whom I later hired.

29. I started my 2255 in early 2010 and pursued it *pro se* to the best of my abilities. I came to understand the importance of providing the Court with a clearly articulated set of facts. Hence, this Supplemental Affidavit.

## EFFORTS TO MITIGATE LOSS

30.   Nooter's July 16, 2008 letter to this Court adequately sets forth my mitigation efforts. Contrary to Nooter's later assertions, no one declined to testify, they just weren't enthusiastic to do so (who would be?). Also, the offers were more formal than Lehman Attorney Greenbaum credits in his 7/14/08 affidavit. Specifically, an initial offer came from Odom and Rowland in May 2003   to finance a package that would ultimately have the titles deeded to my company, Diamond Star Financial. The offer included a letter of commitment, which makes it a bona fide offer and which negate's Greenbaum's assertions.  I have a copy of that letter and so does the Government. This is the offer that was "chased away" by FBI Agent McCarthy (see Nooter's 7/16/08 submission, p.3). Next came Al Piche and a group of Canadian investors. They were preparing an offer of $21 million when AUSA Brown advised them that the properties were only worth $11 million, which caused them to back out of the deal.  Piche found another investor, who was willing to offer $15 million, but was told by Greenbaum he was too late. Piche also contradicts Attorney Greenbaum's assertions. I also understand Carmen Alejandro made an offer; he certainly met with AUSA Brown several times in summer 2003. Additionally, mortgage broker Broit was negotiating financing for my company to buy the properties, and obtained a letter of intent from a reliable investor to

16

refinance the properties through my company, when the US Attorney nixed it. The final offer came from Oscar Brown and a group of investors. They met with the US Attorney in early fall of 2003, but Lehman rejected their offer. I contacted Brown shortly after my sentencing and arranged for him to speak with Nooter. They spoke and Brown agreed to provide an affidavit to verify that he submitted a firm $26 million offer which the banks rejected. Thus, to the extent Greenbaum, and then Nooter, "pooh-poohed" the seriousness of these offers, they are wrong. At a minimum, the differences between us are grist for factfinding.

## AURORA-LEHMAN CORPORATE POLICIES AND STRUCTURE

30.   Two months after my sentencing, Lehman Brothers collapsed. I learned what the whole world did: that Lehman's national policy of acquiring and selling poorly backed mortgage loans had brought the global financial system to the edge of disaster. I could not but wonder how my own case fit into those events. I began to read and to research it. I learned of what one congressional investigator called Lehman's "criminogenic" policies. That meant that Lehman, specifically through Aurora, had deliberately solicited poor quality loans (from schmucks like me) to rapidly inflate such holdings and then sell them as securities. I saw this paralleled the facts of my case. I thought the fact that such policies could now clearly be seen as a nationwide Lehman policy should surely somehow impact my case.

17

31. I also wondered about Aurora and Lehman's corporate relationship. I knew Aurora was a subsidiary of Lehman. But I saw one case that held a loan from a subsidiary of a bank doesn't automatically constitute bank fraud. Then I found information that, at the time of my offense, Aurora was not even a subsidiary of Lehman. Specifically, Aurora was established on 5/15/97. Lehman Brothers Holding Company acquired a stake in Aurora in 1998. In 2003, Aurora became a subsidiary of the Holding Company; in 2004, it became a subsidiary of Lehman Bank. This showed that, at the time of my offense, the only connection between Aurora and Lehman was a stockholder interest. It struck me as odd, because, throughout my case, Aurora and Lehman were treated as one and the same entity, including their employees. I am still unsure of the legal significance of these facts, but both these and the corporate policy noted above propelled in part my Rule 33 motion (still pending with this Court).

I swear under penalty of perjury pursuant to 28 USC § 1746 that the foregoing is true and correct to the best of my knowledge and belief.

Dated this _19_, of December 2011

Jamila Davis

18